UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| PATRICIA ANN KOVACH, | CASE NO. 5:21-CV-01562-SO |
| Plaintiff, | JUDGE SOLOMON OLIVER, JR. |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

### INTRODUCTION

Plaintiff Patricia Ann Kovach filed a Complaint against the Commissioner of Social Security (Commissioner) seeking judicial review of the Commissioner's decision denying supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On August 11, 2021, pursuant to Local Civil Rule 72.2, this matter was referred to me for preparation of a Report and Recommendation. (Non-document entry of August 11, 2021). Following review, and for the reasons stated below, I recommend the District Court **AFFIRM** the Commissioner's decision.

### PROCEDURAL BACKGROUND

Ms. Kovach filed for SSI on January 24, 2019, alleging a disability onset date of July 27, 2008. (Tr. 76). Her claims were denied initially and on reconsideration. (Tr. 75-87, 89-102). She then requested a hearing before an Administrative Law Judge. (Tr. 123). Ms. Kovach (represented by counsel) and a vocational expert (VE) testified at a hearing before the ALJ on May 7, 2020. (Tr.

28-50). On May 27, 2020, the ALJ issued a written decision finding Ms. Kovach not disabled. (Tr. 8-23). The Appeals Council denied Ms. Kovach's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-7; *see* 20 C.F.R. §§ 416.1455, 416.1481). Ms. Kovach timely filed this action on August 11, 2021. (ECF #1).

FACTUAL BACKGROUND

## I. PERSONAL AND VOCATIONAL EVIDENCE

Ms. Kovach was 32 years old at the time of her alleged onset date, and 42 years old at the time of the administrative hearing. (Tr. 21). Ms. Kovach completed her GED. (Tr. 22, 35). Ms. Kovach does not have past relevant work. (Tr. 22).

## II. RELEVANT MEDICAL EVIDENCE[1]

On April 27, 2017, Ms. Kovach began treating with Rica Howarth, PA-C (Neurology),[2] for widespread numbness and tingling, neck pain, back pain, and headaches, possibly stemming from a severe motor vehicle accident in 2007. (Tr. 372-73).

On January 9, 2019, Ms. Kovach met with PA Howarth following a low-speed motor vehicle accident that occurred in a Walmart parking lot four days earlier. (Tr. 372). Ms. Kovach

---

[1]     Ms. Kovach previously applied for disability benefits on April 29, 2013. (Tr. 11, 69). Ms. Kovach received an unfavorable decision denying her application for benefits on November 20, 2015. (Tr. 51-69). Ms. Kovach applied again for SSI on January 24, 2019. (Tr. 76). SSI benefits are only available as of the month the application was filed, and therefore the relevant initial date for evidence purposes is January 24, 2019. (Tr. 11; *see also* 20 C.F.R. § 416.335). I therefore summarize the relevant medical evidence beginning in January 2019, but also reference prior records for longitudinal purposes. (*See* Tr. 11). I note an apparent scrivener's error in the ALJ's decision dating relevant evidence from **July** 24, 2019 despite an earlier reference to Ms. Kovach's application date of **January** 24, 2019. (Tr. 11).

[2]     The ALJ makes an apparent scrivener's error in the decision when referring to Rica Howarth, PA-C, as "Rica Newarth." I treat all references to "Rica Newarth" as referring to PA Howarth. (*See* Tr. 21).

began experiencing new symptoms of pain in her back starting the day after the accident. (*Id.*). Ms. Kovach described sharp pain in both legs when performing physical therapy exercises with stretching bands; she also described the pain as "like my whole spine will be jerked out of place." (*Id.*). Ms. Kovach also reported increased tingling in her face, right hand, and feet, and she dropped more things from her right hand. (*Id.*).

At that visit, PA Howarth described Ms. Kovach as a "complicated" patient who has struggled with chronic pain for years. (Tr. 380). Ms. Kovach finds some relief with her pain by taking Neurontin (gabapentin) 800 mg four times per day. (Tr. 365). PA Howarth had a "candid conversation" with Ms. Kovach about her pain, stating "there is not something that can be fixed to cure her pain." (Tr. 380). Ms. Kovach was tearful at this explanation, but appeared to understand. (*Id.*). PA Howarth started Ms. Kovach on Zanaflex to treat the post-accident back spasm, and instructed her to continue back exercises and avoid steroids and anti-inflammatories. (*Id.*). PA Howarth also indicated it was "unlikely that [Ms. Kovach] will be able to work given clinical condition and number of medication failures to control chronic pain." (*Id.*). PA Howarth suggested Ms. Kovach consider applying for disability benefits. (*Id.*). PA Howarth also recommended a referral to pain management for trigger point injections or epidural injections for chronic pain reduction, but avoided narcotics per Ms. Kovach's treatment request. (*Id.*).

On March 13, 2019, Ms. Kovach treated with PA Howarth, complaining of excruciating, random pains in her hips and feet that feel like a fire/burning/stabbing pain. (Tr. 362). The pains were not improved by rest. (*Id.*). PA Howarth noted Ms. Kovach's past history of psychiatric treatment, including suicidal ideations while on depression medication, after which she stopped that treatment. (*Id.*). Ms. Kovach also experienced negative side effects with Xanax, Ativan, and

3

other medications; Lyrica caused a rash, and Cymbalta caused mental clouding and confusion problems. (Tr. 362-63). Ms. Kovach reported that she feels a wave of symptoms and she "can't think right." (Tr. 362).

On March 14, 2019, Ms. Kovach met with Francisco Lopez, M.D., for her six-month follow-up visit, complaining of six out of ten back pain. (Tr. 548). Dr. Lopez noted chronic low back pain and osteoarthritis. (*Id.*). Dr. Lopez indicated Ms. Kovach was on a high dose of gabapentin, which helped her pain; she is not able to take muscle relaxants. (*Id.*). Ms. Kovach exhibited no pedal edema or cyanosis, no joint swelling, pedal pulses were good, and she exhibited full range of motion. (Tr. 549).

On April 29, 2019, Ms. Kovach treated with Dr. Lopez for chronic pain disorder and a complaint of left quadrant pain under ribs, worse after eating. (Tr. 475, 545). Dr. Lopez indicated Ms. Kovach's history of fibromyalgia and possible irritable bowel syndrome, as well as possible degenerative disc disease and scoliosis, but he did not have the X-ray or MRI records to confirm this diagnosis. (*Id.*). Dr. Lopez recommended Ms. Kovach treat with a pain specialist due to her high dose of 1200 mg gabapentin. (*Id.*).

Upon examination, Ms. Kovach was unable to walk on her toes or heels because of back pain and was unable to handle her balance. (Tr. 476). Ms. Kovach had no joint swelling, good pedal pulses, and full range of motion. (*Id.*). Dr. Lopez noted Ms. Kovach was unable to reach her toes, and had some tenderness on both paraspinal muscle areas with limited flexion and upper back tenderness on palpation. (*Id.*).

Progress notes from a May 29, 2019 appointment indicate PA Howarth had taken over Ms. Kovach's prescription for gabapentin from her primary care physician in April 2019. (Tr. 523). Ms.

Kovach presented for treatment of her migraines, as well as "jumping pain" and swelling with waves of dizziness. (*Id.*). Ms. Kovach reported memory issues and difficulty remembering her grandson's name; medication reduction in the past was not helpful to resolving the memory issues. (*Id.*). Ms. Kovach's anxiety was still high, and she did not tolerate the medication prescribed. (*Id.*). Ms. Kovach also reported worsening pain and increased fatigue. (*Id.*). Ms. Kovach related most of her pain, swelling, and migraines seemed to occur on her left side; she believed that all of her issues may stem from a difficult hysterectomy in which she had a fibroid tumor removed, multiple ovary cysts, and a blood clot that "needed scraped of[f] liver, spleen, and remainder of my insides." (Tr. 523-24).

Ms. Kovach was instructed to discuss her left armpit pain with her new PCP, as well as any heart palpitations she experienced. (Tr. 533). PA Howarth indicated that the swelling in Ms. Kovach's temple, upper, and lower back were most likely related to her headache and existing back issues; PA Howarth prescribed Aimovig for migraine control and dizziness. (*Id.*). Abdominal CT results were pending, which might explain her "jumping pain." (*Id.*). Memory issues may be related to Ms. Kovach's ongoing symptoms and health concerns. (*Id.*). PA Howarth recommended follow-up in two months, around July 29, 2019. (*Id.*).

On August 14, 2019, Ms. Kovach met with PA Howarth and indicated she was having daily headaches, but symptom intensity had been cut in half and her headaches were no longer lasting all day. (Tr. 587). Ms. Kovach reported dizziness, nausea, and diarrhea when eating sugar, and had lost weight without dieting. (Tr. 586-87). She had an upcoming appointment with gastroenterology. (Tr. 587). Ms. Kovach also reported a recent head trauma. (*Id.*). Ms. Kovach was

positive for weight loss, abdominal pain, diarrhea, dizziness, and seizures; all other systems were negative. (*Id.*).

Ms. Kovach met with Dr. Lopez on January 28, 2020, for follow-up and examination of her right breast pain. (Tr. 542). Dr. Lopez noted that Ms. Kovach's neurologist had been prescribing gabapentin for fibromyalgia and chronic pain disorder. (*Id.*). Ms. Kovach had been feeling some pain in her breast, but denied feeling any lumps on self-examination. (*Id.*). Dr. Lopez found no breast tenderness or lump on palpation. (Tr. 543). Dr. Lopez also noted that he filled Ms. Kovach's disability form during a previous visit. (Tr. 542).

On February 13, 2020, Ms. Kovach met with PA Howarth, complaining of right-sided dizziness and yellow spots in her vision. (Tr. 578). PA Howarth noted that headaches were still present but better, but also occurred daily. (*Id.*). Ms. Kovach's nausea and dizziness improved with a new GI medication, and dietary improvements also helped her symptoms. (*Id.*). On examination, Ms. Kovach had symmetric and intact coordination, was able to stand from seated without difficulty, had steady gait and adequate speed, and no observed weakness. (Tr. 581-82). PA Howarth increased Ms. Kovach's Aimovig prescription to treat her daily headaches. (Tr. 582).

On May 5, 2020, Ms. Kovach met with PA Howarth and reported symptoms of tiredness where "she is unable to move." (Tr. 570). Ms. Kovach denied any cancer history; CT scans from another hospital did not suggest malignancy. (*Id.*). Ms. Kovach had low energy, decreased concentration, mood/memory impairment, and change in appetite (and was taking medications for appetite stimulation). (*Id.*). PA Howarth noted vague symptoms with unclear etiology; possible diagnoses included neuropathy, hypocalcemia, B12 deficiency, and vasculopathy. (Tr. 571). PA

Howarth consulted with psychiatry and neurology; Ms. Kovach was instructed to continue taking Neurontin. (*Id.*).

## III.  MEDICAL OPINIONS

**PA Howarth.** On March 21, 2019, PA Howarth completed a physical assessment form. (Tr. 455-56). In it, PA Howarth indicated Ms. Kovach's diagnosis of chronic pain syndrome, and that Ms. Kovach's symptoms were severe enough to interfere with her attention and concentration on a constant basis. (Tr. 455). PA Howarth noted Ms. Kovach experienced dizziness, unsteadiness, irritability, and fatigue due to the side effects of her medication. (*Id.*). PA Howarth opined Ms. Kovach would require additional breaks to recline or lie down during the workday. (*Id.*). Ms. Kovach would need unscheduled breaks during the workday, every thirty minutes to one hour, for fifteen to thirty minutes each. (*Id.*). Ms. Kovach could walk one block before needing rest due to pain, sit for up to one hour and stand/walk up to one hour in an eight-hour workday. (*Id.*). PA Howarth opined Ms. Kovach was able to lift less than ten pounds occasionally and unable to lift more than ten pounds. (*Id.*). PA Howarth indicated Ms. Kovach is limited in repetitive reaching, handling, and fingering, and could only use her bilateral hands, fingers, and arms for two percent of the workday. (*Id.*). She would be absent more than four times per month. (Tr. 456).

On the same date, PA Howarth provided a mental capacity assessment of Ms. Kovach's mental work-related limitations. (Tr. 460-61). In that assessment, PA Howarth noted Ms. Kovach's diagnoses of depression/anxiety, fatigue, sleep disturbance, and medication side effects. (Tr. 459). She provided the following assessment of various limitations:

| Degree of Limitation | Ability Limited |
|---|---|
| **None** | • to distinguish between acceptable and unacceptable work performance<br>• to maintain personal hygiene and appropriate work attire<br>• to be aware of normal hazards and take appropriate precautions<br>• to cooperate with others, or ask for help when needed |
| **Mild** | • to use reason and judgment to make work-related decisions<br>• to initiate and perform a task she knows how to do<br>• to work close to or with others without interrupting or distracting them<br>• to set realistic goals<br>• to make plans independently of others |
| **Moderate** | • to follow one- or two-step oral instructions to carry out a task<br>• to recognize a mistake and correct it, or identify and solve problems<br>• to sequence multi-step activities |
| **Marked** | • to work at an appropriate and consistent pace, or complete tasks in a timely manner<br>• to ignore or avoid distractions while working<br>• to adapt to changes<br>• to manage psychologically based symptoms |
| **Extreme** | • to sustain an ordinary routine and regular attendance at work<br>• to work a full day without needing more than the allotted number or length of rest periods during the day |

(*Id.* at 459-61).

**David Bousquet, M.Ed. O**n April 17, 2019, Dr. Bousquet completed a psychological evaluation. (Tr. 463-70). Dr. Bousquet indicated Ms. Kovach's behavioral health history, including attending outpatient counseling sessions "on and off for years." (Tr. 464). Dr. Bousquet indicated Ms. Kovach exhibited pain behaviors throughout the 50 minute examination, including being restless and fidgety, and facial grimacing and reddening. (Tr. 467). Dr. Bousquet noted that Ms. Kovach described symptoms associated with clinical depression and PTSD. (Tr. 468). Dr. Bousquet indicated a diagnostic conclusion of PTSD and Disruptive Mood Dysregulation Disorder, recurrent severe. (Tr. 469).

Dr. Bousquet provided a narrative of Ms. Kovach's functional assessment, describing average intellectual functioning, but that "given her overall emotional and psychological

functioning these abilities would have tendencies to be compromised." (*Id.*). Ms. Kovach had

difficulties attending and concentrating, but could be refocused; she described distractibility due to

pain and by thoughts. (*Id.*). Dr. Bousquet opined these issues would present difficulty in Ms.

Kovach's ability to maintain attention and concentration and to maintain an acceptable

persistence and pace in a work setting. (*Id.*). Dr. Bousquet also opined Ms. Kovach would have

difficulty with her ability to conform to social expectations in the work setting. (Tr. 469-70).

Finally, Dr. Bousquet opined that Ms. Kovach would have difficulties in her ability to respond

appropriately to workplace stresses and pressures. (Tr. 470).

**Dr. Lopez.** On May 3, 2019, Dr. Lopez completed a medical report,[3] providing a narrative

of Ms. Kovach's diagnoses, the nature and symptoms of her conditions, pertinent findings on

---

[3]      The form provided by Opportunities for Ohioans with Disabilities requested that
Dr. Lopez submit "a medical report or copies from existing office records." (Tr. 474). In response,
Dr. Lopez provided both copies of his office records (*see* Tr. 475-510) and the narrative "report."
(Tr. 472-74). Exhibit C8F, containing Dr. Lopez's narrative, was wholly treated as medical evidence
of record, and not as medical opinion evidence. (*Compare* Tr. 92 *with* Tr. 472-510).

The regulations define other medical evidence as "evidence from a medical source that is
not objective medical evidence or a medical opinion, including judgments about the nature and
severity of your impairments, your medical history, clinical findings, diagnosis, treatment
prescribed with response, or prognosis." 20 C.F.R. § 416.913(a)(3). For adult claimants, medical
opinion evidence is defined as "a statement from a medical source about what you can still do
despite your impairment(s) and whether you have one or more impairment-related limitations or
restrictions in the abilities" to perform physical and mental demands of work activities, other
demands of work using the senses, or the ability to adapt to environmental conditions. *Id.* at
§ 416.913(a)(2)(i)(A)-(D).

Dr. Lopez's narrative includes a response describing the "limitations [Ms. Kovach's]
impairment(s) imposes on the ability to perform sustained work activity." (Tr. 473). Dr. Lopez's
response to this question may satisfy the regulatory requirements to constitute a medical opinion.
(*Compare* Tr. 473 *with* 20 C.F.R. § 416.913(a)(2)-(3)). However, the state agency reviewers did not
treat it as opinion evidence (Tr. 92), and the ALJ did not mention it at all when explaining the
persuasiveness of medical opinion evidence. (*See* Tr. 17-21).

In other circumstances, this may have required remand to correct the error by omission. 20
C.F.R. § 416.920c(b) ("We will articulate in our determination or decision how persuasive we find
all of the medical opinions . . . in your case record."); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541,

examination, diagnostic test results, medications, prescribed therapy, any compliance issues, and the limitations on Ms. Kovach's work ability imposed by her conditions. (Tr. 472-74).

The narrative described Ms. Kovach's diagnoses as chronic back pain disorder, degenerative disc disease, previous cervical/lumbar compression fracture from a motor vehicle accident in 2007, fibromyalgia, depression/anxiety, and history of migraine headaches. (Tr. 472). Dr. Lopez described Ms. Kovach's symptoms, stating she has had chronic neck and low back pain since a 2007 motor vehicle accident, in which she had a cervical/lumbar compression fracture; she also has a history of fibromyalgia, IBS, depression and anxiety. (*Id.*). Ms. Kovach is on a high dose of gabapentin for her chronic pain. (*Id.*).

Examination findings demonstrate tenderness on both lower paraspinal muscle area and limited flexion in her lumbar spine, but full range of motion without pain in her cervical spine. (*Id.*). Ms. Kovach was unable to walk on heels and toes due to loss of balance; reflexes are 4+ bilaterally, with no focal weakness. (*Id.*). Ms. Kovach appears anxious and depresses easily since she is no longer able to do the things she used to do. (*Id.*). Dr. Lopez indicated additional consultative and diagnostic testing results were available from a neurology clinic in Pittsburgh. (*Id.*). Dr. Lopez opined that Ms. Kovach required no surgical intervention. (*Id.*). Dr. Lopez listed Ms. Kovach's medications as gabapentin 1200 mg 3x daily, baclofen 10 mg, topiramate 25 mg, and levothyroxine 85 mg daily. (Tr. 473). Dr. Lopez described these medications as "high dose

---

546-47 (6th Cir. 2004) ("Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights."). But this error was not raised by either party. Therefore, any error as to whether Dr. Lopez's report should be considered a medical opinion under the regulations is deemed waived as not raised in the claimant's opening brief. *Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003).

Neurontin [gabapentin] seems to help w[ith] her chronic pain & fibromyalgia. Topiramate helps prevent migraines. Not on meds for depression." (*Id.*). Dr. Lopez noted no compliance issues. (*Id.*).

The final question on the form requests as follows:

If the patient is an adult, please describe any limitations his/her impairment(s) imposes on the ability to perform sustained work activity. . . . If the impairment is physical in nature, please be specific in regarding the ability to sit, stand, walk, bend, stoop, lift, grasp, etc. If the condition is psychological be specific regarding the ability to concentrate, think clearly, communicate and relate with others, follow instructions, take care of personal needs and to function independently.

(*Id.*). In response, Dr. Lopez stated, "Because of her chronic back pain, fibromyalgia & depression/anxiety, she is not able to perform work activity." (*Id.*).

**State Agency Reviewers.** State agency medical consultants reviewed Ms. Kovach's record at the initial and reconsideration levels.

Michael Lehv, M.D., reviewed Ms. Kovach's record at the initial level on May 2, 2019. (Tr. 83-86). Dr. Lehv adopted the RFC findings from the November 20, 2015 ALJ decision, which found Ms. Kovach has the residual functional capacity to perform a range of sedentary work except requiring a sit/stand option allowing a change of position briefly for one to two minutes every thirty minutes; no crouching, crawling, balancing, or climbing ladders, ropes, or scaffolds and no more than occasional stooping or climbing of stairs or ramps; no concentrated exposure to extreme heat and cold, wetness and humidity, vibration, respiratory irritants, or hazards such as dangerous moving machinery or unprotected heights; no more than frequent handling and fingering bilaterally. (Tr. 84).

Cynthia Waggoner, Psy.D., reviewed Ms. Kovach's mental health record at the initial level on April 26, 2019, and adopted the mental residual functional capacity findings from the November 20, 2015 ALJ decision. (Tr. 81-85). Dr. Waggoner indicated, based on the ALJ's prior

11

findings, that Ms. Kovach was limited to simple, routine instructions and tasks, performed in a low-stress setting, defined as requiring no assembly line work, no fast-paced production requirements, and no more than occasional changes in work routine or setting; no contact with the public and only occasional interaction with coworkers and supervisors. (Tr. 84).

Leanne Bertani, M.D., reviewed Ms. Kovach's record at the reconsideration level on July 27, 2019. (Tr. 97-99). Dr. Bertani also adopted the prior RFC findings from the November 20, 2015 ALJ decision. (Tr. 99).

Robyn Murry-Hoffman, Ph.D., reviewed Ms. Kovach's record at the reconsideration level on July 27, 2019; Dr. Murry-Hoffman made no changes on reconsideration and also adopted the mental residual functional capacity findings from the November 20, 2015 ALJ decision. (Tr. 100).

IV. ADMINISTRATIVE HEARING

The following summarizes the testimony of Ms. Kovach and VE James Ganoe, presented during the hearing before the ALJ.

Ms. Kovach stated she lived with her husband, their two daughters, and two grandchildren. (Tr. 33). Ms. Kovach helps her husband watch their grandchildren while their mother is at work; she cannot watch the grandchildren on her own because she is unable to lift them. (*Id.*). Her husband is not always able to control her grandson; some days she will stay in her room and may not come out. (*Id.*). Due to anxiety issues, Ms. Kovach has never held a driver's license. (Tr. 34). Her husband drives her to the store and she will take medical transportation services to doctor's appointments. (*Id.*). Ms. Kovach completed her GED; she attempted community college classes but did not finish a degree. (Tr. 35).

Ms. Kovach described her inability to work due to depression and being around people. (Tr. 36). She also experiences back pain where her feet and back will "go out" and she needs to crab crawl to climb the stairs. (*Id.*). Ms. Kovach had a prior hysterectomy and carpal tunnel surgery on her right wrist. (*Id.*). She is not a candidate for neck or back surgeries. (Tr. 36-37). She takes medications for her pain, but they make her dizzy and tired. (Tr. 37). Ms. Kovach has not participated in physical therapy since 2015. (*Id.*).

Ms. Kovach can wash a small load of dishes by hand, and can do other small household chores such as folding towels or wiping the bathroom sink. (*Id.*). Ms. Kovach can check her email and Facebook, but she does not have friends, either in-person or on Facebook. (Tr. 38).

Ms. Kovach described her relationship with her primary care physician, Dr. Lopez, negatively. (Tr. 39-40). She sees him every three to six months for thyroid treatment and medication management. (*Id.*). Ms. Kovach also treats with "Dr." Howarth, a physician assistant, every three to six months. (Tr. 40). PA Howarth treats Ms. Kovach for her migraines and back. (*Id.*). Ms. Kovach described her migraines as usually occurring on the right side and like a hammer beating her in the head. (Tr. 40-41). She has light sensitivity and must go into a dark room. (*Id.*). The migraines have reduced in frequency from daily to about three times per week, lasting anywhere from a few minutes to a few hours. (Tr. 41). Ms. Kovach takes Topamax for her migraines, and has also tried a monthly shot. (*Id.*).

Ms. Kovach takes gabapentin for her back pain and fibromyalgia. (*Id.*). She also tries to use hot compresses and massages to relieve her back pain, but those treatments do not always work well with her fibromyalgia. (Tr. 41-42). Ms. Kovach will try other methods for pain relief such as hot baths or repositioning. (*Id.*). Ms. Kovach has difficulty walking due to her pain; on a good day

13

she can walk two blocks, but only three feet on a bad day. (Tr. 42). Standing in one place hurts more than walking; Ms. Kovach can only stand five or ten minutes but must keep repositioning during that time. (Tr. 42-43). Ms. Kovach must sit on soft surfaces and cannot sit on wooden chairs. (Tr. 43). Ms. Kovach might be able to sit in a hardback, workplace-style chair for about ten or twenty minutes, depending on the day. (*Id.*).

Ms. Kovach has difficulty bending and kneeling; she picks items off the ground with a grabber or with her toes. (Tr. 44). Ms. Kovach also has difficulty using buttons and zippers. (*Id.*). She has started using plastic products because she was dropping too many plates, and she slips her shoes on. (*Id.*).

Ms. Kovach does not take medication for her mental health conditions. (Tr. 45). She has attempted medications in the past but stopped after experiencing suicidal ideations. (Tr. 45-46).

Ms. Kovach treats her gastrointestinal issues, including IBS, with a Dr. Purewal. (Tr. 46). She has difficulty keeping food down and is constantly in the bathroom. (*Id.*).

The VE then testified. The ALJ asked the VE to consider a hypothetical individual of the same age, education, and work experience as Ms. Kovach, who retains the capacity to perform sedentary work; she can alternate sitting or standing positions for up to two minutes at thirty minute intervals without going off-task; with no foot control operation bilaterally; occasional postural limitations, except no climbing of ladders, ropes, or scaffolds; no crouching, crawling, or balancing; limited to frequent manipulation bilaterally; must avoid concentrated exposure to extreme cold and heat, and to wetness and humidity, and to excessive noise and excessive vibration, and to irritants and chemicals; must avoid all exposure to unprotected heights, hazardous machinery, and commercial driving; limited to simple, routine, and repetitive tasks,

14

requiring only simple decisions with no fast-paced production requirements and few workplace changes; no interaction with the public and only occasional interaction with coworkers and supervisors. (Tr. 48). The VE identified the following jobs that could be performed by an individual so limited: document preparer, DOT 249.587-018, SVP 2, unskilled, 24,000 jobs available nationally; bench worker, DOT 729.684-018, SVP 2, unskilled, 13,000 jobs available nationally; and final assembler, DOT 713.687-018, SVP 2, unskilled, 26,000 jobs available nationally. (*Id.*).

The VE further testified that most employers will allow an individual to miss one or two days per month, but will not permit an employee to miss more than 12 days in a calendar year. (Tr. 49). An employer would permit an individual to have a fifteen-minute break in the morning and afternoon, and a half-hour to hour-long break at lunch. (*Id.*). An employer would not permit more than ten percent off-task behavior outside of those scheduled breaks. (*Id.*).

## THE ALJ'S DECISION

The ALJ's decision, dated May 27, 2020, included the following findings of fact and conclusions of law:

1.  The claimant has not engaged in substantial gainful activity since January 24, 2019, the application date (20 CFR 416.971 *et seq.*).

2.  The claimant has the following severe impairments: chronic pain syndrome; migraines; lumbar and cervical spine degenerative disc disease; history of right carpal tunnel syndrome; left carpal tunnel syndrome; fibromyalgia; hypothyroidism; vitamin D deficiency; depression; generalized anxiety disorder; and post-traumatic stress disorder (PTSD) (20 CFR 416.920(c)).

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.  The claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) (i.e. is able to occasionally lift and/or carry no more than 10 pounds; frequently lift and/or carry articles like docket files, ledgers, and small tools; stand and/or walk, with normal breaks, for a total of 2 hours in an 8-hour workday; and sit, with normal breaks, for a total of about 6 hours in an 8-hour workday), except the claimant must be allowed to alternate sitting or standing positions for up to 2 minutes at 30 minutes intervals without going off task; cannot operate left or right foot controls; no climbing ladders, ropes, or scaffolds, crouching, crawling, or balancing; can occasionally climb ramps and stairs, stoop, and kneel; can frequently reach, overhead reach, handle, finger, and feel bilaterally; must avoid concentrated exposure to extreme cold and heat, wetness and humidity, excessive noise, excessive vibration, chemicals, and irritants, such as fumes, odors, dust, and poorly ventilated areas; must avoid all exposure to unprotected heights, hazardous machinery, and commercial driving; limited to simple, routine, and repetitive tasks, requiring only simple decisions, with no fast-paced production requirements and few work place changes; and capable of no interaction with the public and only occasionally interaction with co-workers and supervisors.

5.  The claimant has no past relevant work (20 CFR 416.965).

6.  The claimant was born on June 6, 1976 and was 42 years old, which is defined as a younger individual age 45-49, on the date the application was filed (20 CFR 416.963).

7.  The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.  Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since January 24, 2019, the date the application was filed (20 CFR 416.920(g)).

(Tr. 13-23).

STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of

evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights. *Wilson*, 378 F.3d at 546-47.

STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5.      Can claimant do any other work considering her residual functional
        capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Ms. Kovach argues the ALJ's RFC determination is not supported by substantial evidence because the ALJ did not properly evaluate PA Howarth's opinions in accordance with the regulations. (Pl.'s Br., ECF #10, PageID 657, Pl.'s Reply Br., ECF #12, PageID 682). In support, Ms. Kovach contends that, pursuant to SSR 96-8p, an RFC is an assessment of a claimant's ability to do sustained work activities on a regular and continuing basis. (Pl.'s Br., ECF #10, PageID 657-58). Ms. Kovach appears to argue that PA Howarth's opinions demonstrate that she cannot sustain work-related activities. (*Id.* at 658-59). In Ms. Kovach's view, the ALJ erred because he referred to "examination findings detailed above" rather than re-explaining them fully when finding PA Howarth's opinions unpersuasive; this is a legally inadequate explanation, fails to inform her of why her claim for disability was rejected, and does not provide an accurate and logical bridge to support the findings. (*Id.* at PageID 660-64).

19

The Commissioner counters that the ALJ properly considered the opinion evidence from PA Howarth and appropriately followed the regulations to describe the opinion in terms of its supportability and consistency. (Comm'r's Br., ECF #11, PageID 675-76). The Commissioner compares the ALJ's consideration of PA Howarth's opinion with the evidence contained in PA Howarth's treatment notes, as well as comparison against the other medical opinions provided by the state agency consultants. (*Id.* at PageID 676-79).

I agree with the Commissioner. It is the role of the ALJ, not this Court, to weigh the evidence, resolve significant conflicts in it, and make appropriate determinations based on the evidence presented. *Bradley v. Sec'y of Health & Hum. Servs.*, 862 F.2d 1224, 1227 (6th Cir. 1988). Even if substantial evidence supports the opposite conclusion, this Court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.

Under 20 C.F.R. § 416.920c, for claims filed on or after March 27, 2017, the ALJ is to articulate "how persuasive [he] find[s] all of the medical opinions and all of the prior administrative medical findings in [the] case record." 20 C.F.R. § 416.920c(b). The ALJ is not required to defer to or give any specific evidentiary weight to a medical opinion, and is not required to give a treating source controlling weight. *Id.* at § 416.920c(a). Instead, the ALJ must articulate the consideration given to the medical opinions in the record, grounded in the two "most important factors"—supportability[4] and consistency.[5] *Id.* at § 416.920c(b).

---

[4]    "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his medical opinion(s) or prior administrative medical finding(s), the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).

[5]    "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim,

The ALJ is responsible to form an RFC appropriate to the claimant's abilities, supported by the ALJ's evaluation of the medical evidence. *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004). The RFC is to be an assessment of the claimant's remaining capacity for work, once the claimant's limitations have been considered. *Id.* at 632. An ALJ is to consider all evidence in the record to evaluate the limiting effects of the claimant's symptoms, including daily activities, the nature of the alleged symptoms, efforts made to alleviate the symptoms, the type and efficacy of treatments, and other factors regarding the claimant's functional limitations. *Avery v. Comm'r of Soc. Sec.*, No. 1:19-CV-1963, 2020 WL 2496917, at *11 (N.D. Ohio May 14, 2020). The ALJ also must determine the "extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record." *Id.* The ALJ is not required to implement all suggested limitations and may impose more restrictions than are set forth in a medical opinion. Doing so does not mean an RFC is not supported by substantial evidence. *Ross v. Comm'r of Soc. Sec.*, No. 14-11144, 2015 WL 1245830, at *11 (E.D. Mich. Mar. 18, 2015).

Here, while misstating her professional capacity, the ALJ considered PA Howarth's opinions in the following terms:

> The medical source statement of nurse practitioner, Rica Newarth is not persuasive. This source opines that the claimant can only sit for 1 hour and stand/walk for 1 hour in an 8-hour workday and would miss more than 4 days a month of work due to her conditions. Such statement consists of a check box form and includes no support, with no citations to objective evidence or explanations for such restrictive limitations. Moreover, such restriction limitations are inconsistent with the claimant's routine treatment and the essentially unremarkable physical examination findings detailed above.
>
> The opinion of nurse practitioner, Rica Newarth, concerning the claimant's mental limitations is also not persuasive. This source opines that the claimant has several

the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

>   marked and extreme mental limitations. However, just as above, she provides no
>   support, with no citations to objective evidence or explanations for such restrictive
>   limitations. Moreover, such restriction limitations are inconsistent with the
>   claimant's lack of mental health treatment and the minimally abnormal mental status
>   examination findings detailed above.

(Tr. 21). As the ALJ indicated , there is little support found within PA Howarth's opinion.

(*Compare* Tr. 21 *with* Tr. 455-56, 459-61). The opinion forms consist primarily of check-the-box

responses without much, if any, space available for narrative descriptions. (Tr. 455-56, 459-61).

But I read the ALJ's decision "as a whole and with common sense." *Buckhanon ex rel. J.H. v.*

*Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2010). The ALJ does not simply dismiss PA Howarth's

opinion evidence as unsupported without considering the treatment notes available in the record.

(*See* Tr. 19-21). Referring to the examination findings elsewhere in the decision, the ALJ describes

PA Howarth's treatment notes, such as that Ms. Kovach's headaches were improved with

medication (*compare* Tr. 19 *with* Tr. 578, 587), and that her dizziness was improved when PA

Howarth adjusted her medications. (*Compare* Tr. 19 *with* Tr. 578). The ALJ also considered that

PA Howarth referred Ms. Kovach to pain management, because there was "'nothing to be fixed' to

cure her pain." (Tr. 19, 380). PA Howarth recommended possible epidural or trigger point

injections to help her pain, but it does not appear that Ms. Kovach followed up with pain

management for these treatments. (Tr. 380). The ALJ also considered that Ms. Kovach's

examinations with neurology showed her well-appearing and in no apparent distress, able to rise

from seated to standing, normal gait, normal muscle mass and tone, and no weakness. (Tr. 19,

581-82). Similarly, Ms. Kovach's primary care physician found normal findings on exam but could

not heel/toe walk due to back pain. (Tr. 19, 476).

22

The ALJ also compared the other opinion evidence in the record from the State Agency consultants and the consultative examiner. (Tr. 20-21). In all, the ALJ found that the lack of mental health treatment and the unremarkable physical examination findings cut against Ms. Kovach's claimed disability. (*Id.*). However, the ALJ still considered the available evidence and included mental limitations and manipulative, environmental, and foot control limitations in the RFC that went beyond those from the November 2015 ALJ decision. (*Id.*).

I find the ALJ properly considered PA Howarth's medical opinions and substantial evidence supports his decision. Finding no error that warrants remand, I therefore recommend the District Court affirm.

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **AFFIRM** the Commissioner's decision denying supplemental security income.

Dated: July 25, 2022

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

OBJECTIONS, REVIEW, AND APPEAL

Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).

24